22302.  CAMPBELL TILE AND MANTEL COMPANY *v.*
LYNCH ENTERPRISE FINANCE CORPORATION.

556

DECIDED SEPTEMBER 1, 1932.

*Winfield P. Jones,* for plaintiff.

*Jones, Evins, Powers & Jones, Alston, Alston, Foster & Moise,* for defendant.

LUKE, J.   Campbell Tile & Mantel Company brought its declaration in attachment, in four counts, against S. A. Lynch Enterprise Finance Corporation, to recover $7,764.80, with interest thereon at seven per cent. per annum from May 1, 1927.   During the trial of the case the court refused to admit evidence presented by the plaintiff, and on one occasion refused to declare a mistrial; and timely and appropriate exceptions were taken to these rulings.   At the conclusion of the evidence, the court granted a nonsuit, and exception was taken to this ruling.

In count 1 it is averred: that the defendant is indebted to the plaintiff as above stated on a promissory note dated February 1, 1927, and due May 1, 1927; said note being "executed by the defendant in the trade name and fiction of East Coast Enterprises Inc. [a dummy corporation owned, controlled, managed, and operated by the defendant and used as a conduit or instrumentality for the execution and delivery of said note], and, for value received, delivered to plaintiff." This count (as well as each of the other counts of the declaration) avers also that "plaintiff did, on April 19, 1930, sue out an attachment against defendant, returnable to the July term, 1930, of said court, which said attachment was duly levied by service of summonses of garnishment upon the First National Bank of Atlanta, Fulton National Bank, and the Citizens & Southern National Bank."

Count 2 is an action upon the same note described in the previous count, and is substantially as follows:   That on or about March 25, 1926, the Realty Construction Company was indebted to plaintiff in the sum of $8,957 for labor and material furnished by plaintiff under a contract made between them on June 22, 1925, for the job of furnishing tile and marble work in the certain hotel building known as the Columbus Hotel, at Miami, Fla.; that at said time the payment of said indebtedness, although demanded, having been refused, plaintiff was entitled, and proposed to pursue, its remedies for the collection thereof, and for the enforcement of its lien for the labor and material so furnished as aforesaid, which, under the laws of Florida, had attached to said hotel building and grounds or leasehold upon which it stood; that at said time the de-

fendant, in the trade name and fiction of the East Coast Enterprises Inc. [a dummy corporation created by it under the laws of Florida, owned, controlled, operated and managed by the defendant, and through the instrumentality and conduit of said dummy corporation], the real owner of said building and the land, or leasehold estate, upon which it stood, did, in consideration of the discharge by plaintiff of said indebtedness, and the release of its lien against said property, pay the plaintiff the sum of $967 and execute and deliver to it its note, in the trade name and fiction of said East Coast Enterprises Inc., for the sum of $8,000, dated May 1, 1926, and maturing on August 1, 1926; that upon the maturity of said note the defendant paid the interest thereon and $500 upon the principal, and executed and delivered to plaintiff its renewal note, in the trade name and fiction of said [dummy corporation or instrumentality] East Coast Enterprises Inc., as aforesaid, due ninety days thereafter, and upon the maturity thereof, and on February 1, 1927, delivered plaintiff its renewal note, in the name and fiction of East Coast Enterprises Inc. for $7,764.80 due May 1, 1927.

The bracketed words in the two foregoing counts appeared in the petition as originally drawn, but by amendment those words were stricken.

Count 3 avers that the defendant "is indebted to it [plaintiff] in the sum of $7,764.80, with interest thereon at the rate of 7% per annum from May 1, 1927, by reason of the following facts: That on June 22, 1925, the East Coast Enterprises Inc., a corporation organized under the laws of Florida, through the Realty Construction Company, made with plaintiff a contract for the tile and marble work in a certain bulding then being constructed by the East Coast Enterprises Inc., and known as the Columbus Hotel, at Miami, Fla., and in accordance with the terms, specifications and conditions thereof, for the sum of $55,500 for the labor and material thereunder furnished; that at said time and place, Y. F. Freeman, defendant's vice-president and executive manager, was in charge and control of the activities of said East Coast Enterprises Inc., as vice-president and manager thereof, and in its behalf caused the Realty Construction Company, as its agent, to execute said contract, as aforesaid; that under the immediate supervision of said Freeman, acting as the managing director of defendant as well as of said East Coast Enterprises Inc., as aforesaid, the plaintiff

completed the furnishing of the material and work under said contract, and, on March 25, 1926, upon the completion thereof, became entitled to the immediate payment of $8,957 for labor and material furnished on said building; that on . . March 25, 1926, upon demand for the payment thereof, the defendant, through said Y. F. Freeman as its vice-president and executive manager in charge of its operations and of the construction of said building, agreed with and promised plaintiff that, in consideration of the acceptance by plaintiff, in discharge of said indebtedness and release of his lien upon said property, of $957 in cash and the balance of $8,000, as evidenced by a promissory note of the East Coast Enterprises Inc. for $8,000, dated May 1, 1926, and due August 1, 1926, with the privilege of renewal until May 1, 1927, executed through its officers, including said Y. F. Freeman as vice-president thereof, the defendant would pay the said balance due plaintiff, as aforesaid, as evidenced by said note, or the final renewal thereof; that upon the maturity of said note the interest thereon and the sum of $500 was paid upon the principal, and thereupon a new note for $7,500 executed by said East Coast Enterprises Inc., dated August 1, 1926, and payable on November 1, 1926, was given plaintiff; and upon its maturity, and on February 1, 1927, a renewal note, payable on May 1, 1927, for $7,764.80, was executed by said East Coast Enterprises Inc., and delivered to plaintiff."

In lieu of setting out count 4, we quote from the brief of counsel for the plaintiff in error as follows: "The third and fourth counts differ in that, whereas in the third count the original indebtedness is alleged to have been against the East Coast Enterprises Inc., the owner of the hotel, the Realty Construction Company, the contractor, is in the fourth count alleged to be the original debtor. There is, however, no substantial difference between the two counts in so far as is concerned the defendant's liability, since, in each event, the defendant's promise to see to it that the balance due plaintiff for labor and material furnished on said building, as evidenced by the note of the East Coast Enterprises Inc., is paid, rests upon ample consideration."

The note declared upon in the first two counts, and referred to in counts 3 and 4, is attached to the petition as an exhibit. It is dated February 1, 1927, and is due May 1, 1927, bears interest from

date at seven per cent. per annum, payable to Campbell Tile and Mantel Company, and is signed:

> "East Coast Enterprises, Inc.
> "By R. E. Laramore, Vice-Pres. (Seal.)
> "By J. M. Frazer, Treasurer (Seal.)"

General and special demurrers were filed to each of the four counts of the petition; the petition was amended as hereinbefore indicated; and the demurrers were overruled. This ruling was not excepted to.

In answering count 1 the defendant admitted that it had not paid said note, admitted that an attachment was sued out against the defendant, put the plaintiff upon proof of the other material allegations of the petition, and pleaded non est factum. By amendment to count 3 the defendant pleaded as follows: "The defendant denies that any promise was made by it to pay the note of East Coast Enterprises Inc., . . or any note whatsoever of East Coast Enterprises Inc.; but says that if there had been any such promise, it was a promise required by . . the statute of frauds to be in writing, because such a promise would be the promise to answer for the debt, default, or miscarriage of another person, and by the terms of the statute of frauds a promise to answer for the debt, default, or miscarriage of another person is required to be in writing and can not be enforced unless such promise is in writing." The answer to count 2 is substantially the same as that to count 1, and the amendment to count 4 invoking the statute of frauds is identical with that made to count 3. The defendant's answer to count 3 admits that it did not pay the alleged indebtedness, admits the suing out of said attachment, puts the plaintiff upon proof of the other material allegations of the count, and further pleads that the "note sued on . . is not the act and deed of this defendant . . , was not executed by the defendant nor any one authorized by this defendant to execute it in its behalf, nor by any officer or agent of this defendant." Defendant's answer to count 4 is essentially the same as its answer to the preceding count.

Plaintiff introduced in evidence the defendant's charter, from which it appears that the defendant was a Delaware corporation, with power "to guarantee the evidences of indebtedness created by any other corporation;" that the defendant could "make and perform contracts of every kind with any person, firm, or corporation;"

that it could "acquire the good will, rights and property, and . . undertake the whole or any part of the assets or liabilities of any person, firm, association or corporation," and that it could "conduct . . the whole or any part of the business so acquired and . . exercise all the powers necessary . . in and about the conduct and management of such business." Plaintiff also introduced in evidence the defendant's by-laws, which disclose that the defendant could maintain an office in Atlanta, Ga.; that the defendant's president "shall be the chief executive officer of the corporation," and "shall have general and active management of the business of the corporation;" that the vice-president "shall, in the absence or disability of the president, perform the duties and exercise the powers of the president;" and that the treasurer shall have custody of the corporate funds, and shall keep accurate accounts of the receipts and disbursements of the corporation. Plaintiff next introduced an agreement between opposing counsel that "Y. F. Freeman, the defendant's vice-president, was on March 25, 1926, on account of the absence of its president, S. A. Lynch, authorized and empowered to exercise the powers of the defendant's president as determined by the defendant's by-laws."

C. P. Campbell, sworn for the plaintiff, testified: that he had been the plaintiff's president since 1914; that on June 22, 1925, "plaintiff, through its secretary, executed a contract with Realty Construction Company to furnish the tile and marble work on the Columbus Hotel building, at Miami, Fla., for the sum of $55,500;" that "this contract was practically completed on March 25, 1926;" that "Mr. Freeman was there" and "gave us instructions to do different things;" that when the job was practically completed witness "went to the Realty Construction Company to straighten up the matter," and "Mr. Thweatt, of the Realty Construction Company" told witness "to see Mr. Freeman;" that "Mr. Thweatt and I came to an agreement as to the amount due the plaintiff;" that "the balance was around $11,000, according to the records of the Realty Construction Company;" that "Mr. Freeman told me to come to defendant's offices . . , and when I got in Mr. Freeman's office Mr. Palmer and I straightened it up;" that witness did not know what position Palmer held, but that he was "around on the job, . . was with the hotel;" that witness and Freeman "arrived at . . $8,957 as the balance due plaintiff;" that "we

were to release Realty Construction Company and our right to file a mechanic's lien on the job;" that witness thought that the release was signed next morning in the office of the Realty Construction Company; that Freeman gave witness a check for $957 and a note for $8,000, and witness "was required to sign a waiver of the mechanic's lien on the job."

The witness Campbell then identified the following paper:

"Campbell Tile and Mantel Co., Miami, Fla. March 25, 1926.

"Gentlemen: We are handing you herewith our check No. 152, drawn on the Bank of Bay Biscayne, in the amount of $957, and note for $8,000, dated May 1, 1926, and due Aug. 1, 1926, bearing interest at the rate of seven per cent. per annum, which check and note constitute settlement in full on account of work which you have done on Columbus Hotel and Exchange Building. It is hereby distinctly understood and agreed that upon maturity of this note, if we do not care to settle in full, we have the option of paying $2,000 and renewing the balance for a period of ninety days." (The paper further provides for two other renewals at the expiration of ninety-day periods, the last time for renewal being Feb. 1, 1927). Very truly yours,

"East Coast Enterprises Inc., by Y. F. Freeman, Vice-president.

"Accepted: Campbell Tile & Mantel Co., By C. P. Campbell."

We quote from the testimony of the witness C. P. Campbell as follows: "He [Freeman] said that the S. A. Lynch Enterprise Finance Corporation was interested in collecting the rents and making the disbursements of it, and that 'we'll see that you get your money.' As to what was said about the check . . and the note and any renewal of the note, it was stated that he would see to it we would get our money and how it was to be paid. I have never received any money since that time except a payment of $500 on the first renewal of the note, and the last renewal included principal and interest on the preceding renewal, being the amount of the note. Campbell next testified that certain renewal notes were given, in line with the scheme set out in the letter, quoted above, the final renewal note being the one declared upon in counts 1 and 2. We quote further from the testimony of the witness Campbell as follows: "At the time I got the note dated May 1, 1926, I also got the check of the East Coast Enterprises Inc. for $957. The check . . was signed by T. W. Palmer, President-Treasurer,

and J. M. Frazer, Secretary. The note . . for $8,000 . . was payable to plaintiff's order, and was signed by the East Coast Enterprises Inc., by T. W. Palmer. I received a letter from East Coast Enterprises Inc. signed by J. M. Frazer, Treasurer, asking plaintiff to accept a check for $640 of the East Coast Enterprises Inc., $500 to apply on the principal of the $8,000 note, and $140 to cover the interest thereon, and a new note for $7,500 principal, dated August 1, and due November 1, 1926. This check and note I accepted." This witness next testified as to the transactions leading up to the making and delivery of the last renewal note, to wit, the note dated February 1, 1927.

It next appears from the record that "plaintiff introduced in evidence the minutes of a meeting of defendant's directors held in Miami, Fla., on January 28, 1925, evidencing the passage of a resolution authorizing the execution by defendant's officers of a contract guaranteeing the installation of furniture in the Columbus Hotel Building." It appears from said minutes that "the chairman submitted to the meeting a lease proposal between the Miami Holding Company, lessor, and the East Coast Enterprises Inc., lessee, for a term of ninety-three years, covering all" of described lots and the Columbus Hotel, which was erected on said property. Said resolution recites that "inasmuch as the Miami Holding Company has this day guaranteed the installation of the furniture in the hotel to be erected on" said lot, "and that it is to the best interests of this company to see that said furniture is installed, . . the officers of this company are hereby authorized to negotiate for and in behalf of this company such instrument, or instruments, as may be necessary to effect such guarantee."

We quote further from the record as follows: Plaintiff introduced in evidence the contract executed by and between the Miami Holding Co., and S. A. Lynch Enterprise Finance Corporation, as "Guarantors," with the G. L. Miller & Co. Inc., designated therein as the "Underwriter," dated May 28, 1925, for the installation of furniture in the Columbus Hotel Building. The contract referred to recites that "by virtue of the financial interest of such guarantors in the construction by the East Coast Enterprises Inc." of said hotel "to be erected . . on a ninety-three year leasehold interest" in described land located in Miami, Fla., "and in further consideration that the making of this guaranty was the

inducement to the Underwriter to enter into a certain agreement with the East Coast Enterprises Inc., known as an underwriting agreement, and dated January 31, 1925, wherein said Underwriter agrees to sell, and underwrites, at a given figure, bonds of an aggregate principal sum of $1,600,000, to be issued by the East Coast Enterprises Inc., against the aforesaid property, the net proceeds of which is to be used to improve the same." For the purposes of this decision, the foregoing sufficiently indicates the nature of the contract in question, and we shall not set out that contract in full. Said contract is signed, "Miami Holding Company," by its vice-president and secretary, and "S. A. Lynch Enterprise Finance Corp.," by its vice-president, Y. F. Freeman, and its secretary.

It next appears from the record that the plaintiff introduced in evidence "a stipulation, made between counsel for the parties litigant, that a second mortgage bond issue for $600,000, secured by a mortgage on the leasehold interest held by the East Coast Enterprises Inc. from the Miami Holding Company upon the Columbus Hotel site, and upon the Columbus Hotel building erected thereon, was executed by the East Coast Enterprises Inc. on March 5, 1926, and that on the same date the defendant purchased the said $600,000 of bonds . . for $480,000."

H. M. Thweatt, sworn for the plaintiff, testified as follows: "I am and was connected in 1925 and 1926 with the Realty Construction Company. On May 7 and June 2, 1925, it contracted with the Miami Holding Company and East Coast Enterprises Inc., for the building of the Columbus Hotel, Miami, Fla. Plaintiff completed its contract with us, dated June 22, 1925, during the early part of 1926. Freeman and Campbell came to my office when the note was delivered. At that time a formal waiver of lien for the labor and material furnished by Campbell Tile and Mantel Company was executed to the Realty Construction Company, East Coast Enterprises Inc., and G. L. Miller & Co. This lien waiver was in the usual form of waivers, and covered all material and labor furnished by plaintiff on the job." On cross-examination Thweatt swore: "The East Coast Enterprises Inc. was putting up the Columbus Hotel. The Realty Construction Company was the contractor, . . acting as agent for the East Coast Enterprises Inc. and the Miami Holding Company."

T. W. Palmer, sworn for the plaintiff, testified: "I was con-

nected with the Miami Holding Company in 1924. I had a contract with S. A. Lynch in reference to the ownership and control of that company." The contract referred to by this witness appears as "Plff.'s Exhibit AA," and is in the form of a letter written by T. W. Palmer to S. A. Lynch, at the bottom of which the following appears: "I hereby accept the above proposition, and will agree to carry out my end of the transaction in accordance with the terms thereof. (Signed) S. A. Lynch." Said contract substantially appears from the following: "This is to advise you that I will transfer all of my equities, mortgages, contracts of sale, fee titles, leaseholds, notes, stocks, and all interests which I may have in Dale County, Fla., together with all of the assets of Miami Holding Company, to a corporation to be formed, of which I and my associates shall own 49% of the stock, and you and your associates shall own 51% of the stock, with the understanding that in payment of such assets the corporation will execute bonds bearing 8% interest, payable $50,000 eighteen months from date, $150,000 twenty-four months from date, and $300,000 payable thirty-six months from date. . . The corporation shall be organized under the State of Florida, and shall take over all of the assets mentioned above, and the issue of bonds as described above. It is understood that I shall be elected president of said corporation at a salary of $20,000 per year. . . It is agreed . . that as long as I am a stockholder of said corporation I shall remain president thereof and draw a salary of $20,000 per year. . . The corporation shall be controlled and managed by its board of directors, and my dealings as president shall be dictated and ratified by said board of directors. . . The board of directors shall be four in number, three of whom shall be controlled by you. . ." This paragraph further stipulates that "all of the stock of the corporation shall be indorsed in blank and left with the Bank of Bay Biscayne subject to a buy-or-sell proposition upon sixty days' notice by either party, . . and said stock shall remain with the Bank of Bay Biscayne as collateral security until full payment shall be made. Said bond issue of $500,000 . . is to be sold by me for $425,000, of which amount $100,000 is to be paid over to you to liquidate my indebtedness to Mr. Grimes. Should you make any profit out of this transaction, it will be entirely satisfactory to me."

We continue with the testimony of T. W. Palmer: "There was

a $500,000 bond issue executed by the Miami Holding Company on the four ground leases for 99 years upon what is now the Columbus Hotel site. The East Coast Enterprises Inc. was created in 1924. The bonds cover all the assets of the Miami Holding Company. As president of the Miami Holding Company I signed the bonds. There was a sublease created and given to a subsidiary that was organized by the Lynch interests—East Coast Enterprises Inc. This building was then put on that property by the East Coast Enterprises Inc. The capital stock of the Miami Holding Company consisted of 5,000 shares. . . I was president of the East Coast Enterprises Inc. after the issue of the bonds. The Miami Holding Company gave a sublease to the East Coast Enterprises Inc. of what is now the Columbus Hotel site for the remainder of the term of the original 99 year underlying leases. The contract for the erection of the Columbus Hotel was made by the East Coast Enterprises Inc. with the Realty Construction Company, after the execution of the sublease hereinbefore referred to, and before the issuance of the $1,600,000 bonds on the property underwritten by G. L. Miller & Co. . . There was a sublease created and given to a subsidiary that was a corporation organized by the Lynch interests. This sublease was to the East Coast Enterprises Inc. The East Coast Enterprises Inc. was created by the defendant for the purpose of enabling that sublease to be made. (By the court) Q. "The Lynch Enterprises refused to take it [the sublease] in its own name? A. Yes, sir. (By the court) Q. And organized another corporation? A. Yes, sir. (By the court) Q. And the transactions were had with it? A. Yes, sir. (By the court) Q. Property taken in its name and building built in its name? A. Yes, sir. (By the court) Q. And finally sold out? A. Yes, sir. (By the court) Q. Did you make these renewal notes with the Campbell people? A. Yes, sir, the East Coast Enterprises Inc. did. (By the court) Q. And you were president? A. Yes, sir."

It further appears, from the testimony of the witness T. W. Palmer, that he thought that R. E. Laramore or J. M. Frazer, under his direction, conducted the correspondence as to the renewal of the notes between the East Coast Enterprises Inc. and plaintiff; that the assets of the East Coast Enterprises Inc. were in the hands of a receiver; that Mr. Lynch told witness "to tell them to write the re-

ceiver;" that witness got "a renewal note after that;" that witness "sent him the renewal˙ . . on the first of February; that Mr. Shutts gave witness instructions as to 'the handling of these renewals;'" that witness also talked about it to Mr. Holcomb; that when money was wanted, "we would go to the Lynch office and get a check;" that "all of our money was furnished down there at that time;" that "we got it from the Finance Company;" that in writing the letters in regard to renewing notes of East Coast Enterprises Inc., a part of the time witness used his own discretion, "trying to stall off the debt;" that witness had been given general directions by Mr. Lynch "to stall as much as he could;" that the conferences had in regard to the unpaid claims against the East Coast Enterprises Inc. "were with Mr. Freeman, Lynch, and myself;" that "Mr. Lynch said . . the Finance Company had paid out as much money as it could, but to hold down the money . . because he was going to be called by the banks that summer;" that "he was talking as president of the Finance Corporation;" that witness "was acting as president of this East Coast Enterprises Inc.;" and that "it was stipulated that Miami Holding Company owned the stock of East Coast Enterprises on January 28, 1925."

■ Complaint is made by the plaintiff that the court erred in excluding from the jury the letter written to S. A. Lynch by T. W. Palmer on February 23, 1924, hereinbefore substantially set out, and marked "Plff.'s Exhibit AA." As a part of this assignment of error it is also averred that the trial judge erred in rejecting the following testimony of the witness T. W. Palmer: "He [S. A. Lynch] told me he always dealt in the name of the S. A. Lynch Enterprise Finance Corporation or other organized corporations which were owned by the Finance Corporation—that he was representing the Finance Corporation. He went on at great detail to tell me how the Finance Company stock was split up, and he had Mr. Freeman and Holcomb in it with him, . . that he had kept control of the Finance Company. He owned something over 30,-000 shares of 60,000 in the Finance Corporation, and was going to carry it on in that way; that he would have Mr. Holcomb to come down later on and set up the books, and they would figure out how they were going to carry on after they came down." The record recites that "as a ground for the said evidence, oral and documentary, . . plaintiff's counsel" made the following statement to

the court: "On the first and second counts we propose to offer evidence to show these facts: That in February, 1924, one T. W. Palmer and S. A. Lynch made a contract whereby they agreed to turn over, to a corporation to be organized, 99-years leases on what is known as the Columbus Hotel site, and that this contract shows that S. A. Lynch is to have control of the directorate and predominate and run this new corporation. We expect to show that thereafter, about March 1, 1924, the Miami Holding Company was reorganized so as to take over and build the Columbus Hotel building on said leasehold interest, and that the majority of the stock certificates of the Miami Holding Company, amounting to 5,000 shares, which had been in the possession of one Grimes, was taken over by S. A. Lynch, and that S. A. Lynch was acting for the Lynch Corporation." The objection to this testimony appears from the following statement of counsel for the defendant: "I want to object to a parol statement to bind this defendant. He is alleging Mr. Lynch made certain admissions binding the defendant, and showed no authority to make those admissions, and on the further ground, he speaks of stock in Mr. Lynch's name, and you can't prove a trust by parol." The court ruled: "I don't think the mere fact that a corporation owns stock, or owns a controlling interest in a subsidiary corporation, makes the corporation liable for the obligations of the subsidiary corporation. This suit is not based upon alleged fraud or deceit, or upon any other hypothesis in the world, and I don't think it is admissible. I'll exclude it."

In order to show the contention of the plaintiff in error fully, we quote as follows from the record: "Mr. Jones: May I state . . that while it is true that mere stock ownership of a corporation doesn't merge the identity of the corporation with the owner, yet . . if, through the ownership of the stock in a corporation, you use it not in the ordinary and normal manner in which a corporation should be used, by participating as a stockholder, and in functioning as such, but you use it as a fiction, that you use it as a means behind which to conduct your own trades and transactions, thus getting the benefit of building this building and the benefit of supplies furnished by this plaintiff without paying for them, then that is legal fraud at least, and the courts will go behind the corporate entities to determine whether or not it was really functioning as a corporation, or merely used by it as a mere trade name

and a fiction." The court's reply to counsel's statement was this: "You have stated your grounds on which it is offered, and I sustain the objection."

The foregoing ground is quite long, but, after examining it carefully in the light of the pleadings, we are satisfied that the court ruled properly, and so hold.

■ Exception is also taken to the court's ruling excluding the following testimony of C. P. Campbell, the plaintiff's president: "Mr. Freeman said they didn't have enough money to pay us—that he would pay part cash and give me a note of the East Coast Enterprises. I asked him how much note he expected to give. He said $8,000; and I told him I didn't know anything about the East Coast Enterprises, whether it was good or not—I hadn't looked into it and didn't know. Mr. Freeman said the note was perfectly good; that S. A. Lynch Finance Corporation was collecting the rents, handling the funds of the East Coast Enterprises, and that, 'We'll see that the note is paid'; and I said that was satisfactory." We think that the rejection of the foregoing testimony was proper, and so hold. It appears next that when the foregoing testimony was offered, and before it was excluded, counsel for defendant objected to the following part of it: "We'll see that the note is paid." After some colloquy between counsel and the court, the court ruled: "I think this agreement is contemporaneous with the execution of the note; I think it is inadmissible." We agree with the court, and hold that the ruling was correct.

■ It appears from the next ground that the court ruled as follows in regard to certain oral and documentary evidence: "I am going to exclude all evidence that would tend to show a fictitious corporation. The suit is based upon the idea that it was a bona fide corporation." Counsel's statement of what he expected to prove covers more than a page of closely type-written matter, and we shall not attempt to set out that statement here. We hold that the court ruled correctly in disallowing the evidence.

■ It is next insisted that the court erred in refusing to grant a mistrial because, when the court suggested that counsel might agree upon what the witness T. W. Palmer would testify to, counsel for the defendant remarked in the presence of the jury: "No, I don't know what he will swear; he is liable to say anything." The court overruled the motion in this language: "I'll overrule your motion

for a mistrial, but will grant a nonsuit in the case." In view of the grant of the nonsuit, and of the necessary result that the jury would not pass upon the case, we see no merit in this ground.

The exceptions to the court's various rulings upon the admission of evidence are, from their very nature, difficult to discuss fully and clearly. We have endeavored to indicate the nature of those exceptions, without unduly prolonging this opinion. As indicated above, we are of the opinion that there is no merit in any of those exceptions.

■ We come next to pass upon the nonsuit. In the first place, it is insisted that the defendant's pleadings did not raise the question that the undertaking declared upon was one to answer the debt, default or miscarriage of another, and was therefore within the statute of frauds. That part of the plea relating to the statute of frauds may not have been perfect, but there appears to have been no demurrer to it, and in this situation we think it sufficiently raises the question sought to be raised by it. The plea has been hereinbefore fully set out, and will not be repeated here. We have also undertaken to present the substance of the evidence that was admitted upon the trial of the case. It clearly appears from the record that S. A. Lynch Enterprise Finance Corporation, the defendant in the court below, Campbell Tile & Mantel Company, the plaintiff in the trial court, East Coast Enterprises Inc., the apparent signer of the note declared upon in counts 1 and 2, the Realty Construction Company, and the Miami Holding Company, were all incorporated entities.

In so far as counts 1 and 2 are concerned, we are satisfied that the note declared upon was not shown to be the obligation of the defendant corporation. Furthermore, while there was considerable testimony in regard to this note, we are unable to find from the record that the note itself was ever introduced in evidence. Therefore, we hold that the nonsuit as to counts 1 and 2 was properly granted.

In *F. & W. Grand &c. Stores Inc.* v. *Eiseman*, 160 *Ga.* 321 (127 S. E. 872), the following rule is laid down: "Writings relied upon to take a transaction out of the statute of frauds must be complete in themselves, and must contain the entire agreement, and must disclose the subject-matter, the parties thereto, and all the terms of the undertaking." Of course, "a promise to answer for the debt,

default, or miscarriage of another" must be in writing. See statute of frauds, Civil Code (1910), § 3222 (2). In this case the note evidencing the indebtedness in question was signed by East Coast Enterprises Inc., and by it alone. If the S. A. Lynch Enterprise Finance Corporation was bound for the debt, it was bound as a guarantor or surety, and its promise appears to have been verbal. See testimony of G. P. Campbell, supra, and other evidence in the case. Our opinion is that the obligations declared upon in counts 3 and 4 come within the statute of frauds, and that there is nothing in the evidence to take them out. It follows that our conclusion is that the nonsuit was properly awarded in so far as counts 3 and 4 are concerned. Therefore the judgment awarding the nonsuit was proper, and the exception to that judgment is not meritorious.

*Judgment affirmed. Broyles, C. J., and Hooper, J., concur.*